BJORGUM LAW, PC
A. Eric Bjorgum (CA State Bar No. 198392)
119 E. Union St., Suite C
Pasadena, California 91103
Telephone: (213) 596-6390
Facsimile: (213) 596-6399
E-Mail: eric.bjorgum@bjorgumlaw.com
*Attorneys for Plaintiff Alan G. Niven*

# IN THE UNITED STATES DISTRICT COURT

# IN AND FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| ALAN G. NIVEN, an individual,<br>　Plaintiff<br><br>　v.<br><br>GUNS N' ROSES, a California partnership, and DOES 1-10, inclusive,<br>　Defendants. | Case No.<br><br>**COMPLAINT FOR:**<br><br>**1. DECLARATORY JUDGMENT OF NON-ENFORCEABILITY OF CONTRACT**<br><br>**2. DECLARATORY JUDGMENT OF NON-BREACH OF CONTRACT**<br><br>**3. TORTIOUS INTERFERENCE WITH CONTRACT OR BUSINESS EXPECTANCY**<br><br>**JURY TRIAL REQUESTED** |

# NATURE OF THE ACTION

1. Plaintiff Alan G. Niven ("Niven") brings this action for seeking a declaration from the Court that he may tell his story and publish his autobiography, despite the threats of Defendants Guns N' Roses. He also brings an action for tortious interference with his publishing contract.

2. Plaintiff Niven is well known for his long career in the music industry, which started in the early 1970s with Virgin Records in England and continued to the 1980s in California, where he signed Motley Crue, managed, produced and co-wrote for Great White, broke popular groups such as Berlin and Dokken, and later produced an acclaimed record with Clarence Clemmons. Between 1985 – 1991, Niven was also the manager of Guns N' Roses ("GNR"). In six years, he took them from being a group that was nearly dropped by Geffen to selling out Wembley Stadium in England.

3. Now in his 70's, Niven wants to tell his story. He has written an autobiography (*Sound N' Fury: Rock N' Roll Stories*) that has been printed by Toronto-based ECW Press. *Sound N' Fury* consists of anecdotes about his career, including distributing the first Sex Pistols singles in the U.S., cooking a dinner for guitarist Robert Fripp, going-to-bat for a scruffy musician named Frank Ferranna (later known as Nikki Sixx), and reinventing Great White twice. It also includes stories involving the members GNR, while he represented the five individuals who made up the classic line-up of the band.

4. Now, however, due to GNR's threats, *Sound N' Fury* languishes in a warehouse. In a letter written in May, 2025, GNR invoked the confidentiality clause in its 1991 buyout Agreement with Niven (the "Agreement") and has blocked publication of the book through repeated threats to Niven and contact with ECW. GNR takes this position despite the following facts (among others):

COMPLAINT OF PLAINTIFF ALAN NIVEN
- 2 -

the Agreement was not signed by all of its members (a material term); GNR's members have commented publicly on Niven; one member encouraged him to write the book; and he has been speaking about his time in GNR for over a decade. *Sound N' Fury*'s publication has been delayed for months, even though it received a favorable review from the *Los Angeles Times*, and has received many preorders.

5. By this action, Niven seeks an expedited hearing under Fed. R. Civ. P. 57 that *Sound N' Fury* can be published and distributed. He also seeks damages for interference with his contract with ECW.

## JURISDICTION AND VENUE

6. This Court has jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship and the amount in controversy exceeds $75,000. Further, this is an action for declaratory judgment pursuant to 28 U.S.C. § 2201, for the purpose of determining a question of actual controversy between the parties as more fully appears in this complaint. Niven is a resident of Arizona, and Defendants have been attempting to use their superior resources and bargaining power to silence him and threaten his livelihood.

7. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this District.

## PARTIES

8. Plaintiff Alan Niven is a resident of Arizona and served as the manager of GNR during their most prolific period.

9. Defendant GNR is a California partnership composed, on information and belief, of W. Axl Rose, Saul Hudson p/k/a Slash, and Michael "Duff" McKagan.

10. DOES 1 – 10 are currently unknown to Plaintiff but will be added if necessary. They may include other signatories to the Agreement, specifically, including Izzy Stradlin, Guns N' Roses, Inc., Corporate Inc, Guns N' Roses Music, Mogobo, Inc. and Presser Groove, Inc.

## FACTUAL BACKGROUND

11. Plaintiff Niven is a famed music manager, musician, producer, writer and story-teller. He began his music career in 1974 under Sir Richard Branson at Virgin Records. From 1977 to 1979, he was the sole face and representation of Virgin/Caroline in the United States. In 1979 – 1980, he had his own radio show on WINZ-Zeta4 in Miami.

12. While living in Sweden in 1981, Niven was contacted by Steve Boudreau of the Torrance-based distribution company Greenworld [GWD] and asked to join their company for sales, marketing and artist development. This period is associated mostly with post-punk rock, new wave and the beginnings of a resurgence of hard rock (or "heavy metal"). This was reflected in the underground music scene of the Los Angeles area. The music business was in a post-1970's recession – the major labels in Los Angeles were known to be on 'signing freezes' and relying on licensing already proven acts.

13. Within a few months, Niven recommended that GWD sign Motley Crue, who had been rejected by every major label in Los Angeles. Niven quickly moved 15,000 copies of their debut record. They were picked up by Elektra Records and have to date sold over 100,000,000 records.

14. Niven was then tapped to oversee GWD's new imprint, Enigma Records. His first signing was Berlin, who became a huge band in the 1980's. He eventually left Enigma and began to manage Dante Fox, who quickly became

Great White. Great White started as a heavy metal band and eventually settled into a more bluesy style, selling over 10 million records.

15. While working with Great White, Niven was tapped to manage Guns N' Roses, who were another group that had been considered a bit rough around the edges. Niven's work with GNR is the stuff of legends, as he took them from nowhere to headlining Wembley Stadium in less than six years.

16. In 1991, a buyout agreement (the "Agreement") was entered into between Niven and his company, and GNR and various companies affiliated with it. Broadly, the Agreement laid out the terms for a parting of the ways between GNR and Niven.

17. The Agreement contained mutual Privacy/Confidentiality provisions. In broad strokes, GNR and Niven agreed that efforts would be made to maintain the confidentiality of information concerning each other learned during their mutual association, absent certain conditions best characterized as waivers or written permission. The Agreement says nothing about things learned after the parties went their separate ways. Finally, the Agreement provided that it must be signed by all parties to be effective.

18. As noted, the Agreement was signed 34 years ago. At the time, Niven was under severe personal distress because he had been betrayed by his former employee, the band's lawyer, and his band. He was forced to take a buyout that was far less than he would have received had he stayed with GNR, and he was forbidden *forever* from talking about his time with GNR.

19. In the ensuing years, members or former members of GNR have made many references to Niven, some inflammatory or even defamatory. They have also invited him to appear in documentaries and sometimes encouraged him to

write a biography.

20. For instance, in or about December, 2008, Axl Rose posted online that his eventual full ownership of the name "Guns n Roses" was added as protection against "our then manager" who "was always tryin' to convince someone they should fire me." He claimed that Niven "sensed his days were numbered" and was "attempting to sell our renegotiation out for a personal pay day from Geffen." These comments were reprinted in an interview with Niven in 2008 in "Classic Rock" magazine. Niven responded in great detail, and nobody from GNR complained.

21. Niven has also been discussed in books by Slash and Duff McKagan in a manner that violates the Agreement. Rose has made other statements about Niven that violate the Agreement.

22. Niven was also invited by members of GNR to appear in documentaries regarding the band. *Sound N' Fury* was announced one year ago without any push back from the band. In the 15 years before the book was announced, Niven had done multiple public interviews about the band.

23. Between 2015 – 2018, a member of GNR exchanged emails with Niven multiple times regarding the book and encouraged him to write it.

24. Third parties have written hundreds of articles regarding GNR. There have been multiple biographies written about GNR. On information and belief, Defendants either provided information in connection with these biographies or did not object to it. Members of GNR have also written autobiographies that referenced Niven and the matters allegedly confidential under the Agreement.

25. As noted, Niven entered an agreement with ECW Press, based in Toronto, Canada. The book was meticulously designed and printed. It was

announced in the book trade. Review copies were sent out. Niven began the podcast promotional circuit.

26. On May 9, 2025, Defendants' attorney sent a letter to Plaintiff stating that Plaintiff had violated the Agreement, and that it would seek injunctive and compensatory damages against Plaintiff. Defendants demanded, *inter alia*, that Niven cease from publishing or promoting his book or speaking of any matters that would violate the Agreement.

27. The parties have not been able to resolve this issue, and Plaintiff's publisher has moved the publication release date several times. GNR's attorneys have also contacted ECW and issued thinly veiled threats to the publisher.

28. Over the years, members of GNR have repeatedly referenced Plaintiff by name in interviews and media appearances. In a 2018 Guitar.com interview, Saul "Slash" Hudson discussed Plaintiff's management tenure, describing him as "the guy who kept the whole circus moving in the early days."

29. In a 2021 Classic Rock Magazine feature, Michael "Duff" McKagan recounted "the split with our manager Alan Niven" and acknowledged that "he worked hard for the band until the very end."

30. In multiple YouTube and podcast interviews — including Appetite for Distortion (2019) and Rock Talk with Mitch Lafon (2020) — band members have openly discussed events and business decisions that occurred under Niven's management, including financial settlements, recording sessions, and personal disagreements, often mentioning Plaintiff directly.

31. On information and belief, Axl Rose and other representatives have also allowed the band's official social media accounts and authorized biographies to reference Plaintiff's role in the band's history, his removal, and his contributions

to the band's success, all without restriction or confidentiality.

32. These public disclosures by Defendant's members and agents have collectively placed the relevant facts of the band's relationship with Plaintiff into the public domain and made them matters of public interest. There is also an interest 80's music in general. Finally, *Sound N' Fury* contains anecdotes about Niven's entire career – not just about Niven's former charges, GNR.

## CAUSES OF ACTION

### COUNT 1 – FOR DECLARATORY JUDGMENT OF UNENORCEABILITY

33. Plaintiff reiterates and reincorporates for the foregoing paragraphs as though alleged herein.

34. The Agreement is unenforceable for at least the following reasons:

(i) A material term of the Agreement was that it would be signed by all parties, and Axl Rose did not sign the contract.

(ii) The Agreement was a simple buyout of Niven's rights, but it included a confidentiality provision of unlimited duration, and Defendants' interpretation of this provision renders it unenforceable as unconscionable and in contravention of (i) Niven's right to speak freely about his own past; (ii) Niven's contractual right to respond to the statements made about him; (iii) Niven's freedom to engage in fair trade; and (iv) the public's right to learn about matters of public interest. Further, Niven was also under severe mental distress when the Agreement was signed, having been betrayed by the band members who were once comrades-in-arms. The Agreement included buyout terms that were unfair and were essentially forced on Niven along with the purported obligation that he never discuss the band again.

The Agreement was substantively unconscionable.

(iii) The Agreement was signed by Hudson, McKagan and Stradlin as "The Band" in 1991, but it is unclear who is attempting to enforce the Agreement now, and whether they have standing to do so. Rose did not sign the Agreement, and one signatory (Stradlin) has remained silent.

35. Thousands of copies of *Sound N' Fury* have been printed and continue to incur storage expenses. The release date has been moved several times. The public is expecting the book to be released, and Niven has accrued advance orders.

36. Defendants have threatened Niven with breach the Agreement if he or his publisher releases *Sound N' Fury*.

37. There is now existing between the parties to this action an actual, justiciable controversy in respect to which plaintiff is entitled to have a declaration of his rights to publish *Sound N' Fury*, and further relief, including an expedited hearing under Fed.R.Civ.P. 57 and a prohibitory injunction, because of the facts, conditions, and circumstances hereinafter set out.

## COUNT II – FOR DECLARATORY JUDGMENT OF NON-BREACH, WAIVER, ESTOPPEL, AND STATUTE OF LIMITATIONS

38. Plaintiff reiterates and reincorporates for the foregoing paragraphs as though alleged herein.

39. Since the partial signing of the Agreement in 1991, members of GNR have mentioned Niven, sometimes in a derogatory, starting at least as far back 1991. Niven has been discussed in books by Slash and Duff McKagen. He has also been mentioned in numerous articles and interviews by members of GNR, often in a false light. On information and belief, members of GNR have given interviews to biographers of the band discussing Niven. Niven's comments about

the Band are thus justified by the Agreement, which allows him to comment on matters raised by the Band first.

40. Niven has been invited by members of GNR to speak in a documentary. He has been publicly interviewed for years about his time with GNR. Members of GNR have also encouraged Niven to write the book. For these reasons, any claim of breach by GNR is barred because (i) GNR has waived its rights to enforce the confidentiality clause; (ii) GNR should be estopped from claiming that Niven violated the confidentiality clause; and (iii) any claims of violation are barred by the statute of limitation.

41. Enforcement of the confidentiality provision would be illegal and in violation of the Constitutional protection of free expression under Art. I, Section 2 of the California Constitution and Art. 2, Section 6 of the Arizona Constitution.

42. For these reasons, Niven requests a declaration from the Court that any violation of the confidentiality provision is subject to the affirmative defenses of waiver, estoppel, statute of limitation and violation of his rights of free expression.

43. There is now existing between the parties to this action an actual, justiciable controversy in respect to which plaintiff is entitled to have a declaration of his rights to publish *Sound N' Fury*, and further relief, including an expedited hearing under Fed.R.Civ.P. 57 and a prohibitory injunction, because of the facts, conditions, and circumstances hereinafter set out.

**COUNT THREE – TORTIOUS INTERFERENCE WITH CONTRACT OR BUSINESS EXPECTANCY**

44. Plaintiff reiterates and reincorporates for the foregoing paragraphs as though alleged herein.

COMPLAINT OF PLAINTIFF ALAN NIVEN
- 10 -

45. Niven has a contract with publisher ECW Press, Ltd. ("ECW"), based in Toronto, Canada (the "Publishing Contract"). Included in the Publishing Contract were standard clauses regarding marketing support.

46. Defendants GNR are aware of the Publishing Contract. Also, as veterans of pop culture industry and marketing, GNR are aware of the importance of building a "buzz" in the market before material is released.

47. Defendants GNR have been in contact with ECW regarding the Publishing Contract.

48. Defendants have intimidated or induced ECW to delay or withhold publication of *Sound N' Fury*, which has resulted in, *inter alia*, substantial interference with the marketing efforts and press momentum for *Sound N' Fury*. Defendants' actions have also caused delay and confusion among the buying public as to when the book will be available for purchase.

49. Defendants' interference was without justification and improper.

50. Defendants' interference has resulted in damages to Niven from lost sales and lost reputation in the market for his book and life story, only a fraction of which has anything to do with Defendants' rock group. Individual advance orders have been cancelled. The books have incurred storage fees. Niven's momentum in the press has been destroyed. He is over 70 years old and has suffered reputational and emotional damage from this Defendants' interference with his publishing contract.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests:

1. A declaration that *Sound N' Fury* may be published and distributed and

that Agreement or its confidentiality provision is void and unenforceable;

2. A declaration that *Sound N' Fury* may be published and distributed because Niven's comments are not a breach of the Agreement or that, if they are, any breach is excused on the basis of estoppel, waiver, statute of limitation or freedom speech;

3. An expedited determination under Fed.R.Civ.P.57 that *Sound N' Fury* can be distributed, and it does not violate the Severance Agreement, or that any such violation is excused;

4. Damages, including exemplary or punitive damages, for Defendants' willful interference with Niven's publishing contract, destruction of the value of his press campaign and emotional and economic advantage.

5. Costs and attorneys' fees as permitted by law; and

6. Any other relief deemed just and proper.

# DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

RESPECTFULLY SUBMITTED this 3rd day of November, 2025

**BJORGUM LAW, PC**
By: /s/ A. Eric Bjorgum
A. Eric Bjorgum (CA State Bar No. 198392)
Attorneys for Plaintiff Alan G. Niven